**In re IN–STORE ADVERTISING SECURITIES LITIGATION.**

No. 90 CIV. 5594 (KC).

United States District Court, S.D. New York.

Dec. 30, 1993.

Sharon Levine Mirsky, Milberg Weiss Bershad Specthrie & Lerach, New York City.

Marian P. Rosner, Wolf Popper Ross Wolf & Jones, New York City.

Peter Cooper, Baer Marks & Upham, New York City.

Frank M. Holozubiec, Kirkland & Ellis, New York City.

Matthew Gluck, Fried Frank Harris Shriver & Jacobson, New York City.

Dennis J. Block, Weil Gotshal & Manges, New York City.

Sid Davis, Davis Markel & Edwards, New York City.

## OPINION and ORDER

CONBOY, District Judge:

Pending before the Court is the summary judgment motion of defendant KPMG Peat Marwick ("Peat Marwick"), which seeks to dismiss plaintiffs' federal and state law securities fraud claims on the ground that they are time-barred. For the reasons set forth below, the motion is granted with respect to

the federal claims and denied without prejudice with respect to the state law claims.[1]

## BACKGROUND

This case arises from the sale of common stock pursuant to a July 1990 Initial Public Offering ("IPO") by a company called In-Store Advertising, Inc. ("In-Store"). Plaintiffs are a putative class of purchasers who claim that they were induced into buying In-Store securities through misrepresentations in In-Store's IPO Prospectus.

Plaintiffs commenced this action on August 29, 1990 ("August 29, 1990 Complaint"), one day following In-Store's announcement that its operating results were substantially below prior projections. The original defendants consisted of: (1) Individual senior officers and directors of In-Store who are alleged to have controlled In-Store and who signed the Company's registration statement; (2) Institutions, including Chemical Venture, Wind Point, ML, and CapCities, which are alleged to have been beneficial owners of a majority of In-Store stock and therefore to have had control directly or indirectly over In-Store and its Board of Directors; and (3) Lead underwriters for the IPO, Alex, Brown & Sons, Inc. and Bear, Stearn & Co., Inc.

The August 29, 1990 complaint alleged violations of Sections 11 and 12(2) of the Securities Act and Section 10(b) of the Securities Exchange Act, as well as state claims for fraud and negligent misrepresentation. This complaint alleged that the Registration Statement and Prospectus contained misrepresentations concerning, among other things, In-Store's true prospects for revenues and income during 1990, and its portrait as an established company. August 29, 1990 Complaint ¶¶ 24–31, 34, 35, 39.

Plaintiffs filed a Consolidated Class Action Complaint on January 14, 1991 ("January 1991 Complaint"), adding several individual and institutional defendants. The January 1991 Complaint alleged the failure of In-Store's financial statements to address deferred billing and extended payment terms that affected the Company's true prospects for revenues. January 1991 Complaint ¶¶ 48, 49, 50, 58, 59, 65–69, 71(c), 85, 86. The same complaint also contained allegations that the final prospectus "[m]isrepresented In-Store's financial condition by failing to create a reserve for uncollectible amounts receivable." *Id.* ¶ 71(h).

As a result of discovery undertaken pursuant to these complaints, In-Store produced to plaintiffs in early 1991 documents including the "Board books." Affidavit of Ellen Wahl Parker, sworn to September 10, 1993 ¶ 5. In addition, on or about May 1, 1991, Peat Marwick produced, in response to a non-party subpoena, all of its workpapers (excluding its proprietary audit programs) for its audit of In-Store's 1989 financial statements and its review of In-Store's first three 1990 quarterly financial statements. *Id.* ¶ 4. During this time, plaintiffs retained an accounting expert to explore the potential of claims against Peat Marwick, who found an insufficient basis at that time to press such claims. Plaintiffs' Br. at 9.

On August 27, 1991, plaintiffs filed a First Amended Consolidated Class Action Complaint ("August 1991 Amended Complaint" or "FAC"). This complaint alleges, based on plaintiffs' review of all of In-Store's Board books and other produced documents, that between March 1990 and July 19, 1990, defendants "entered into a course of conduct to misrepresent In-Store's historical operating results and future prospects for growth and earnings in order to achieve maximum valuation for In-Store in an initial public offering . . . ." FAC ¶ 64. This complaint further alleged that information contained in the Board books put the then-named defendants on notice of the alleged misrepresentations. *See, e.g.,* FAC ¶ 52 ("As a result of the

---

1. Since the filing of Peat Marwick's motion on September 10, 1993, cross-claims have been filed against Peat Marwick for contribution by other defendants. If these claims continue in this action, judicial economy may favor our exercise of supplemental jurisdiction over them despite the dismissal of the federal claims. By contrast, if the contribution claims do not remain in this action, and Peat Marwick has stated their intention to respond to them, the remaining state law claims may be susceptible to dismissal pursuant to section 1367(c). Accordingly, we deny defendant's motion for summary judgment to dismiss plaintiffs' state law claims with leave to resubmit it at such time as may be appropriate.

information contained in the Board books, [each defendant] had actual knowledge of the true state of In–Store's operations both on an absolute term and as compared to prior projections ... Accordingly, all defendants had actual knowledge of the true state of In–Store's commitments from advertisers prior to the Offering.")

On June 11, 1993, In–Store publicly announced that its financial statements for fiscal 1989, which had been included in the prospectus for the IPO, were materially false and misleading. Thereafter, on July 16, 1993, plaintiffs filed a Second Amended Complaint, which added Peat Marwick as a defendant. ("Second Amended Complaint" or "SAC"). This complaint alleges, with respect to Peat Marwick, alleges that "the financial statements for year end 1989 certified by Peat and the financial statements for the first quarter of 1990 reviewed by Peat, all included in the Prospectus, were materially false and misleading." SAC ¶ 122(a). The Second Amended Complaint further alleges that the financial·statements were misstated because the results were based on altered advertising contracts which recognized revenues in advance of performance. SAC ¶¶ 122(a), 123–130, 135. Plaintiffs contend that Peat Marwick knew or ·should have known of the alleged misstatements because "Peat was required to examine In–Store's Board books in the course of reviewing all evidential matter which would corroborate and support the financial statements" and "[h]ad Peat properly performed such examination, it would have detected the irregularities contained therein." SAC ¶ 132.

## DISCUSSION

### The Statute of Limitations in Federal Securities Law Claims

The applicable limitations period for actions brought under Section 11 of the Securities Act is provided in Section 13, 15 U.S.C. § 77m:

> No action shall be maintained to enforce any liability created by Section 77k ... unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should

have been made by the exercise of reasonable diligence.... In no event shall any action be brought to enforce a liability created under section 11 ... of this title more than three years after the security was bona fide offered to the public....

The Supreme Court has adopted the similar one-year/three-year period set forth in Section 9(e) of the Exchange Act, 15 U.S.C. § 78i(e), for actions brought under Section 10(b) of the Exchange Act:

> No action shall be maintained to enforce any liability ..., unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation.

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, ——, —— and n. 9, 111 S.Ct. 2773, 2775, 2782 and n. 9, 115 L.Ed.2d 321 (1991)

■ Under the limitations period for both statutes, the shorter of the one-year or three-year periods applies. *In re General Dev't Corp. Bond Litig.,* 800 F.Supp. 1128, 1135 (S.D.N.Y.1992), *aff'd sub nom., Menowitz v. Brown,* 991 F.2d 36 (2d Cir.1993).

### Application of the One Year/Three Year Limitation to This Action

■ The one year prong of the statute of limitations applicable in this case runs from the time when plaintiffs had actual knowledge of the defendant's fraud, or "knowledge of facts which in the exercise of reasonable diligence should have led to actual knowledge." *Robertson v. Seidman & Seidman,* 609 F.2d 583, 587 (2d Cir.1979) (quoting *Berry Petroleum Co. v. Adams & Peck,* 518 F.2d 402, 410 (2d Cir.1975)); *Menowitz v. Brown,* 991 F.2d 36, 41–42 (2d Cir.1993). The appropriate test for determining the moment at which this limitation period begins to run is an "objective" one, implicating inquiry notice and constructive knowledge. *Armstrong v. McAlpin,* 699 F.2d 79, 88 (2d Cir. 1983); *In re Integrated Resources Real Estate Limited Partnerships Securities Litigation,* 815 F.Supp. 620, 637–38 (S.D.N.Y.1993).

■ This test involves a two-stage analysis. First, we must determine whether at some earlier time "the circumstances [were]

such as to suggest to a person of ordinary intelligence the probability that he [had] been defrauded," *Armstrong,* 699 F.2d at 88, thus placing plaintiffs here on inquiry notice of potential claims against Peat Marwick. Second, if inquiry notice was indeed triggered, we must analyze whether plaintiffs discharged their duty to inquire through the exercise of "reasonable diligence," or, in contrast, have knowledge of the fraud constructively imputed to them. *See, Lenz v. Associated Inns and Restaurants,* 833 F.Supp. 362, 370, 371 (S.D.N.Y.1993) (Conboy, J.).

■■■ In the context of securities fraud cases and the application of statutes of limitations, the Court may make this dual determination of whether inquiry notice has been triggered, and whether plaintiffs have exercised reasonable diligence, at the stage of a motion to dismiss or for summary judgment.[2] *See, e.g., Menowitz,* 991 F.2d at 36 (holding, in the context of a motion to dismiss, that because the test of inquiry notice is objective, "a court's determination that the information available to a plaintiff in a given instance should (or should not) have given him reason to consider and investigate the probability of fraud is surely warranted in appropriate cases") *Lenz,* 833 F.Supp. at 371 ("If it can be determined from the face of the documents and the facts in evidence on a summary judgment motion that plaintiff was placed on notice of the probability of fraud, and he failed to exercise reasonable diligence in discharging that duty to inquire, the court is compelled to impute constructive knowledge of the fraud to plaintiff and grant defendants' motion for summary judgment as a matter of law); *Kronfeld v. Advest, Inc.,* 675

F.Supp. 1449, 1458 (S.D.N.Y.1987) ("the cases are legion in which summary judgment has been granted on the ground that the plaintiff should have discovered his cause of action under the securities law before the statute of limitations had run").[3]

Plaintiffs contend that they were not placed on inquiry notice of potential claims against Peat until the June 1993 announcement by In–Store. We cannot agree. Plaintiffs' Complaints themselves establish that plaintiffs were on inquiry notice of facts supporting a potential claim against Peat Marwick no later than August 1991. In particular, while In–Store did not announce until 1993 that revenues in its 1989 financial statements were overstated, plaintiffs' January 1991 Consolidated Complaint alleged that those financial statements were inflated. Jan. 1991 Complaint ¶¶ 36, 71(i). Those statements were audited or reviewed by Peat Marwick, as was stated explicitly in the Prospectus. During the next six months, moreover, plaintiffs obtained through discovery both In–Store's Board books and Peat Marwick's workpapers for the December 31, 1989 year-end audit of In–Store and the accounting firm's review of In–Store's financial statements for the first, second and third quarters of 1990. The documents provided the basis, at least in part, for plaintiffs' First Amended Complaint ("FAC"), filed in August 1991. FAC ¶ 9. In their 1993 Amended Complaint, plaintiffs allege that the Board books should have made Peat Marwick aware of the putative fraud. More specifically, the Board books should have alerted Peat Marwick or any other person reviewing them that In–Store was falsifying its contracts and

**2.** In the instant case, both parties have submitted affidavits, depositions, and other documents to the Court in support and in opposition to the motion to dismiss. When the Court is presented with such materials which lie outside the four corners of the pleadings, we are required either to exclude the additional materials and decide the motion solely based on the complaint, or to convert the motion to one for summary judgment under Fed.R.Civ.P. 56 *See Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988); *Carter v. Stanton,* 405 U.S. 669, 671, 92 S.Ct. 1232, 1234, 31 L.Ed.2d 569 (1971); *see generally* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1366

(1990 & Supp.1992) (discussing the proper circumstances in which a court may convert a motion to dismiss into a motion for summary judgment). Here, the parties have also completed significant discovery. Thus, the parties cannot be surprised if the Court considers the materials they themselves have both submitted; therefore, the Court elects to converts this motion to dismiss into a motion for summary judgment.

**3.** For a more detailed discussion of the appropriateness of deciding issues of inquiry notice and reasonable diligence at the pre-trial stage, see *Lenz,* 833 F.Supp. at 371 and, in particular, footnote 8.

fraudulently recognizing revenue. *See, e.g.,* Second Amended Complaint ¶ 81 ("Certain of these irregularities [concerning some of In–Store's falsified contracts] were apparent from the face of the Board books . . .") were apparent from the face of the Board . . ."); SAC ¶ 82 ("If defendants had properly exercised due diligence and compared In–Store's Board books against one another, they would have suspected that In–Store's recognition of revenue on [one contract] was fraudulent."). Given that plaintiffs allege that defendants who had access to these Board books were, or should have been, alerted to the alleged fraud, we must infer that plaintiffs' own review of the Board books, coupled with their review of Peat Marwick's workpapers, put them on inquiry notice of potential claims against Peat Marwick.

 Plaintiffs' own response to the foregoing circumstances—hiring an accounting expert to assess the potential of claims against Peat Marwick—bespeaks an acknowledgement of inquiry notice of potential claims running against the accountants to In–Store. The question we must now confront is whether the actions taken by plaintiffs in response to this duty to inquire, including the retention of the accounting expert and his subsequent endeavors, constitute reasonable diligence and thus tolled the running of the statute of limitations.[4] For the reasons set forth below, we hold that they do not, and plaintiffs must therefore be charged with constructive knowledge of the fraud alleged against Peat Marwick as of August 1991.

Plaintiffs assert that, despite their expert's diligent efforts, prior to June 1993 they had insufficient information concerning the deferred billing and improper revenue recognition schemes that constitute the basis of the present claims against Peat Marwick to know of the potential of such claims. This position is untenable in light of the history of this litigation. The 1993 Complaint alleges that "In–Store's 'deferred billing' arrangement . . . "was, in part, a cover-up for the altered contracts and improper recognition of revenues in advance of performance,"

¶ 131(II)(c)) July 1993 Complaint, and that the 1989 financial statements in the Prospectus contained material misrepresentations due to "improper recognition of revenues in advance of performance and. billing." *Id.* ¶ 152. The January 1991 Complaint, however, also contained allegations of the same deferred billing practices and revenue recognition errors with respect to the 1989 financial statements. For example, the January 1991 Complaint specifically accused In–Store of engaging in deferred billing and extended payment terms "in order to inflate reported revenues and net income." Jan. 1991 Complaint ¶ 27; *see also* Jan. 1991 Complaint ¶¶ 33, 36, 48, 49. Thus, even as of January 1991, plaintiffs cannot claim to have been entirely in the dark with respect to the fraudulent scheme underlying their current claims against Peat Marwick.

Despite the foregoing, the actions taken by the defendant after August 1991 and before July 1993 might still constitute reasonable diligence in response to inquiry notice, if prior to the June 1993 announcement plaintiffs had confronted no further opportunities to obtain information probative of Peat Marwick's potential role in the alleged In–Store fraud. This was not the case here. Plaintiffs chose not to pursue discovery which they acknowledge would likely have yielded any remaining information regarding Peat Marwick's actions necessary to the prosecution of the present claims against the accounting firm. First, plaintiffs suggest that their expert could not conduct a full review of Peat Marwick's role because Peat Marwick refused to produce audit programs which "may have assisted plaintiffs in assessing . . . any sustainable claim by plaintiffs in connection with in-Store's 1989 financial statements." Plaintiffs' Brief at 10. Yet plaintiffs voluntarily decided not to pursue production of the audit programs. Finkel Aff. ¶¶ 27 & n. 4, 42; Plaintiffs' 3(g) Stm't ¶ 20; Plaintiffs' Br. at 10 n. 6. Second, plaintiffs failed to contact In–Store's customers in connection with their investigation of Peat Marwick's audits and other accounting work. In

---

4. We note that once plaintiffs are found to have a duty to inquire, they bear the burden of demonstrating that they exercised reasonable diligence in response to that duty. *Lenz, supra,* at 376; *Zola v. Gordon,* 685 F.Supp. 354, 365 (S.D.N.Y. 1988)

their own most recent Complaint, plaintiffs contend that if Peat Marwick had contacted In–Store's customers, it would have uncovered the fraudulent deferred billing and revenue recognition schemes. Accordingly, if plaintiffs had taken the same action in the course of discovery pursuant to the earlier Complaints, they would have made the same discovery. Plaintiffs admit, moreover, that they had the capacity and opportunity to conduct such discovery but chose not do so in order to pursue a particular litigation strategy (i.e., preserving In–Store's potential as a going concern by declining to disturb their customers). Finkel Aff. ¶¶ 16–18, 38; Plaintiffs' 3(g) Stm't ¶¶ 9–11, 29; Plaintiffs' Br. at 13.

In both instances, plaintiffs made a conscious choice to refrain from pursuing available discovery as part of their general litigation strategy. That is their choice, but they cannot avoid the costs. In this Circuit, failure to pursue available discovery in a related lawsuit, when that discovery would have revealed the potential of claims against a new defendant, triggers the statute of limitations and thus may prohibit prosecution of the new claims. *Klein v. Shields & Co.,* 470 F.2d 1344, 1347 (2d Cir.1972) (complaint dismissed because constructive knowledge of fraud imputed to plaintiff who could have exploited discovery in prior lawsuit to learn of facts underlying claim of fraud alleged in later case); *Shamrock Assoc. v. Sloane,* 738 F.Supp. 109 (S.D.N.Y.1990) (holding claim against auditor time-barred when availability of discovery during the pendency of initial lawsuit against company's directors and officers gave plaintiff ability to discover the violations later alleged against the auditor).

In sum, plaintiffs' possession of the Board books and Peat Marwick workpapers that comprise the source of many of their allegations against Peat Marwick, along with plaintiffs' failure to pursue discovery that would have led to the additional facts underlying their claims that plaintiffs allege they did not learn until June 1993, combine to convince this Court that plaintiffs had constructive knowledge of Peat Marwick's alleged fraud no later than August 27, 1991. Accordingly, their federal securities law claims against Peat Marwick are time-barred.[5]

We noted in *Lenz* that statutes of limitations exist in securities law to prevent investors, even unsophisticated ones, from sticking their head in the sand, in ostrich-like denial of events which notify them of the probability of fraud. Limitations of actions, however, also function to prevent investors and their counsel, sophisticated in the ways of complex securities litigation, from uncovering a general fraudulent scheme, initiating large scale lawsuits and concomitant discovery, and then, as a strategic ploy, delaying in the prosecution of potential claims about which they knew or should have known. Therefore, that part of defendants' summary judgment motion seeking dismissal of plaintiffs' federal securities law claims is granted, and that part of defendants' summary judgment motion seeking dismissal of plaintiffs' state law claims is denied with leave to resubmit in accordance with the contingencies discussed *supra* at n. 1.

SO ORDERED.

---

**5.** The claims of the two "new" plaintiffs, Greenberg and IVC, are also time-barred. These plaintiffs had knowledge of many of the events described above, including the publicly filed January 1991 Complaint which contained the original plaintiffs' allegations that the 1989 financial statements were overstated. In response, they did nothing. Nor do they explain whether their putative "new" counsel had any communication with counsel already in the ongoing case. Finally, neither of the plaintiffs have even submitted affidavits to explain their failure to exercise any diligence, much less reasonable diligence. As we noted in *Lenz,* "the exercise of reasonable diligence requires an investor to be reasonably cognizant of financial developments relating to his investment, and mandates that early steps be taken to appraise those facts which come to the investor's attention." 833 F.Supp. at 377.